[Civ. No. 17025.   Second Dist., Div. Three.   July 18, 1949.]

FIRESTONE TIRE & RUBBER COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and JOHN DEWEY DAVIDSON, Respondents.

Kearney, McCartney, Scott & Clopton for Petitioner.

T. Groezinger, Robert Ball and Thelma S. Herzig for Respondents.

WOOD, J.—Petition for a writ of review whereby it is sought to annul an award of the Industrial Accident Commission.

The commission made findings that the applicant, Mr. Davidson, sustained injury arising out of and occurring in the course of his employment, consisting of "precipitation of coronary thrombosis"; that the injury caused temporary total disability "beginning February 11, 1948, to and including September 19, 1948," entitling the applicant to $30 per week during that time; that the injury also caused temporary partial disability "beginning September 20, 1948 to and including November 19, 1948 and thereafter," during which time work of a type which the applicant could perform was not available to him, entitling him to $30 per week during continuance of such temporary partial disability or until further order of the commission; that applicant was entitled to be reimbursed for the reasonable value of medical care and treatment, and was entitled to further medical care and treatment at the expense of defendants. An award was made in accordance with the findings.

Petitioner contends that the "heart attack" suffered by applicant did not arise out of his employment.

The applicant, who was 51 years of age at the time of the injury, was employed by defendant in February, 1944, and worked for defendant steadily thereafter until February 10, 1948, the date of the injury. For a period of approximately four months prior to February 10, 1948, applicant had been working as an attendant in defendant's "uncured" tire storage department. He performed his services in a long aisle which was about 8 feet wide, and in performing those

services he went back and forth over a distance of approximately 70 feet. It was his duty, after tires came from the starching machine, to take them from the floor or a conveyor belt, and place them in metal racks, which racks were constructed one above the other along one side of the aisle—the highest racks being approximately 12 feet above the floor. In order to place tires on the higher racks it was necessary for him to lift the tires with a long pole. It was customary for· the operator of the starching machine, after putting starch on tires, to throw them on the floor. Sometimes the tires would accumulate on the floor of the aisle in such quantities that applicant could not use a hand truck in moving them, and then he would carry the tires. It was also applicant's duty to select certain tires and throw them down chutes to operators of a bagging machine.

On the day the injury occurred, applicant commenced work about 6 a. m. There was evidence that at that time the aisle was full of tires and no tires had been carried from the "back" for the bagging machine; that the operators of the bagging machine were "hollering" for tires; that in order to get tires for them the applicant had to "wade" through tires on the floor, and carry tires from the rear of the aisle—four at a time—two in each hand. There was also evidence that on that morning all the racks were full except the top racks, and that applicant used a 7-foot pole to place tires up on those racks. Applicant testified that he would "pole" tires up on the racks, and then he would run and bring tires for the "baggers"; that he ran continuously; that while doing this work he felt as if his shoulders were pulling loose; and that between 8 and 9 a. m. he felt pain in his chest. About 10 a. m. applicant went to the foreman and complained of pains in his chest. Later that morning he again complained of pains in his chest, and he was sent to the company hospital. His pain became progressively worse, and he was removed to another hospital. Dr. Hunter, applicant's physician, diagnosed his condition as coronary thrombosis.

Dr. Engelberg, a specialist in internal medicine and cardiology, who had examined appellant and had made a cardiogram and taken a history of his case, testified (regarding the cause of the injury) that in his opinion the work applicant "was doing that morning [February 10, 1948] was a direct precipitating cause of his coronary thrombosis." Dr. Engelberg stated in a letter of September 20, 1948, as follows: "In

my opinion severe physical effort such as he [applicant] was engaged in while at work on the morning of February 10, 1948 can be, and in this case was, the direct cause of his heart attack.''

There was evidence indicating that applicant had arteriosclerosis prior to the thrombosis. ''Acceleration or aggravation of a pre-existing disease is an injury in the occupation causing such acceleration.'' (*Naughton* v. *Retirement Board of S. F.*, 43 Cal.App.2d 254, 260-61 [110 P.2d 714]; *Knock* v. *Industrial Acc. Com.*, 200 Cal. 456, 461 [253 P. 712]; see, also, *Lumbermen's Mut. Cas. Co.* v. *Industrial Acc. Com.*, 29 Cal.2d 492, 496 [175 P.2d 823].) Petitioner asserts, in support of its argument that there was no industrial causation, that applicant had done hard work all his life and was a prematurely aged man; that there was nothing unusual about applicant's employment on the day of the injury, and that the work was within the ability of any normal man. In the case of *Liberty Mut. Ins. Co.* v. *Industrial Acc. Com.*, 73 Cal. App.2d 555 [166 P.2d 908], the applicant, who had previously been employed at hard physical labor by another employer, suffered a heart attack while lifting a sack of peanuts which weighed about 120 pounds. The uncontradicted medical evidence therein showed that the applicant had a preexisting heart disease and that effort and exertion were contraindicated for a man of his age and physical condition. In affirming an award in favor of the applicant in that case, the court stated at page 559: ''A person suffering from a preexisting disease who is disabled by an injury proximately arising out of the employment is entitled to compensation even though a normal man would not have been adversely affected by the event. . . . It is obvious that whether the employment proximately precipitated the collapse of a preexisting diseased heart and proximately caused it to collapse before normal progressive developments would have resulted in the collapse is a question of fact.'' The evidence in the present case supports the finding that applicant's injury arose out of and occurred in the course of his employment.

Petitioner also contends, in effect, that the commission should have found that the injury caused permanent partial disability instead of finding that it caused temporary partial disability.

In support of its contention, that the disability is permanent, petitioner relies on the following testimony given by Dr. Engelberg at a hearing on September 23, 1948: ''Q. Do

you anticipate any change for the better or worse? A. No. You see, he had his attack in February and now it is September. That is seven months. That is usually time enough for the completion of the improvement that is going to occur so I do not anticipate any further improvement in his condition. I don't anticipate he is going to get worse either unless he gets any more heart attacks. Q. In other words, you think his condition now is stationary and permanent? A. Except for the eventuality of any further attacks, yes. . . . Q. Your previous answer would indicate you couldn't state any opinion as to how long his condition has been stationary and permanent. A. No, I gather it has been about like this for the past month or two because whereas we keep coronaries—try to keep them from going back to work approximately for about three months, actually, the really firm healing of the heart takes at least six months. There is lots of evidence to show that."

It appears from that testimony that applicant's disability had become permanent at some time prior to the hearing on September 23, 1946. The determination of the question as to whether an injury is permanent is a question of fact to be ascertained from the evidence (*Wold* v. *Industrial Acc. Com.*, 42 Cal.App.2d 512, 513 [109 P.2d 398]). There was no evidence, medical or otherwise, which controverted the testimony of Dr. Engelberg that applicant's disability had become permanent. Counsel for applicant asserts that, at a hearing on November 19, 1948, the applicant testified he had improved. The transcript of the testimony at that hearing does not disclose testimony to that effect. Counsel apparently has reference to a statement in a letter written by Dr. Engelberg on September 20, 1948, wherein he reported that while examining applicant on September 9, 1948, applicant stated to him that he had improved somewhat in the past few months. In addition to the above quoted testimony of Dr. Engelberg that applicant's disability became permanent, there were written statements by applicant's attending physician and by Dr. Engelberg and another physician to the effect that applicant was able to do light work but he would never again be able to do other than light work. The finding that the injury caused temporary partial disability beginning September 20, 1948, is not supported by the evidence. In the case of *Industrial Indem. Exch.* v. *Industrial Acc. Com.*, 90 Cal.App.2d 99 [202 P.2d 585], applicant sustained a heart injury when a bandsaw broke and a small piece of steel lodged in his heart. The commission made an award therein for temporary total

disability. There was evidence in that case that the applicant was incapable of performing any work, and that there was no prospect that his condition would improve, but his general condition might be improved by certain medical treatment. In annulling the award in that case the court stated at page 102: ''His disability is now permanent though his physical condition may be subject to change for the worse or to slight periodic improvement.''

The award is annulled and the case remanded to respondent commission for further proceedings.

Shinn, P. J., and Vallée, J., concurred.